MARTIN (THURSTON v.). See Case No. 14,-018.

---

## Case No. 9,167.

### MARTIN v. TOOF et al.

[1 Dill. 203;[1] 4 N. B. R. 488 (Quarto, 158).]

District Court, E. D. Arkansas. 1870.[2]

BANKRUPTCY—FRAUDULENT PREFERENCE—BURDEN OF PROOF.

1. The inability to pay debts in the ordinary course of business as merchants in trade usually pay them, constitutes insolvency within the meaning of the bankrupt act [of 1867; 14 Stat. 517].

2. Where a party cannot pay his debts in the ordinary course of business and knows that he cannot, he will be held to have had knowledge of his insolvency.

3. The necessary effect of a conveyance to creditors in satisfaction either in whole or in part of a pre-existing debt, by one who knows that he is insolvent. is a preference in fraud of the bankrupt act, and he must be held to have intended this as a necessary result of his action.

[Cited in Alderdice v. State Bank of Virginia, Case No. 154; Re Jacobs, Id. 7,159.]

4. Ignorance of the law cannot avail creditors who are possessed of facts that show the insolvency of the debtor, and a preference received under such circumstances is fraudulent and void.

5. Where a transaction that contemplates the securing of a debt is out of the ordinary course of business, the bankrupt act declares it to be prima facie fraudulent, and the onus of showing that it is not so is cast upon the defendant.

[See Babbitt v. Walbrun, Case No. 694.]

[Cited in Washburn v. Huntington, 78 Cal. 576, 21 Pac. 306.]

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported. Decree of circuit court affirmed by supreme court in 13 Wall. (80 U. S.) 40.]

[Suit in bankruptcy by Martin, assignee, &c. against Toof, Phillips, and others.]

Watkins & Rose, for plaintiff.

Garland & Nash, for defendant.

CALDWELL, District Judge. W. P. Haines & Co., a firm composed of W. P. Haines and C. E. Chetlain, were retail merchants doing business at Augusta, in this state. On the 29th day of February, 1868, they filed their petition praying to be adjudged bankrupts, and on the 22d May, 1868, they were so adjudged, and the plaintiff appointed assignee. On the 18th day of January, 1868, the bankrupts conveyed to the defendants for the consideration of $1,876.84, to be credited on a debt due from the bankrupts to the defendants, an undivided half of a parcel of real estate owned by the bankrupts as partnership property. At the same time the bankrupts assigned to F. M. Mahan, one of the members of the firm of Toof, Phillips, & Co., a title bond they held for certain other real estate in the town of Augusta, on which the bankrupts had made valuable improvements. This title bond was assigned to said Mahan for the consideration of $7,000, also to be credited on the indebtedness of the bankrupts to Toof, Phillips, & Co. There were some $740 of the purchase money still due on said property, and this said Mahan paid and procured a conveyance to himself from one Hough, the owner of the fee of the property.

The plaintiff charges that these conveyances were made in fraud of the bankrupt act; that the bankrupts were insolvent at the time they made them; that they were made with intent to give a preference to the defendants, and that the defendants at the time said conveyances were made, knew or had reasonable cause to believe the bankrupts were insolvent, and that said conveyances were made in fraud of the bankrupt act. Plaintiff also charges that the assignment of the title bond to F. M. Mahan, one of the defendants, was in fact for the use and benefit of the defendants, and for the purpose of securing the said property or its value to the defendants, in fraud of the rights of the other creditors of the bankrupts, and that this purpose was well known to, and participated in, by said Mahan.

In determining this case, the following inquiries arise: (1) Was the firm of W. P. Haines & Co. insolvent at the date of these conveyances? (2) Were these conveyances made with a view to give a preference to defendants over the other creditors of the bankrupts? (3) Did the defendants have reasonable cause to believe the bankrupts were insolvent?

1. That the bankrupts were in fact hopelessly insolvent at the date of this transaction cannot be questioned, as will be seen from the following statement of their liabilities and assets:

| | | |
|---|---:|---:|
| Indebtedness of firm at date of conveyance as per schedules on file and referred to in deposition of Haines | $55,353 01 | |
| Individual indebtedness of members of the firm: | | |
| Chetlain | 3,850 00 | |
| Haines | 105 00 | |
| Total indebtedness at date of conveyances | $59,308 01 | |
| Assets of firm as per schedules | $21,851 41 | |
| Stone house and lot, say | 1,800 00 | |
| Dwelling house of each partner, say $2,000 each | 4,000 00 | |
| | | 27,651 41 |
| Excess of liabilities over assets. | | $31,656 60 |

About $18,000 of the assets consisted of notes and accounts, most of which are shown to be worthless. Nearly all of the remaining assets as shown by bankrupts' schedules, consisted of personal property on which defendants held a mortgage, and the real estate embraced in the bankrupts' conveyances to defendants. The stock of goods on hand invoiced as shown by the schedules, $2,600. And this was the condition of the bankrupts' property at the date of the conveyances to the defendants. Chetlain and Frisbie both testify that the bankrupts sold no goods and did no business after that time. The indebtedness of the bankrupts is stated by some of the witnesses to have been from $31,000 to $35,000. How this discrepancy occurs between the statement of indebtedness by the witnesses and the statement of the indebtedness by the bankrupts in their schedules does not appear, and is not material, as taking either as correct the bankrupts were hopelessly insolvent. All the bankrupts' indebtedness, with slight exceptions, was in the shape of commercial paper, and with the exception of a debt owing to Walker Bro. & Co., amounting only to some $1,000, was over-due and unpaid at the date of this transaction. Creditors had pressed the bankrupts for payment of their debts without result; their stock of goods had been levied on, and their store closed by the sheriff by virtue of an execution issued on a judgment against one of the bankrupts; they had contemplated going into bankruptcy, and during the fall and winter of 1867-68, they only paid (excluding payments to defendants) $500, on an indebtedness of over $50,000 then over-due. The inability to pay debts in the ordinary course of business, as merchants in trade usually do, constitutes insolvency within the meaning of the bankrupt act. The bankrupts could not pay their debts in the ordinary course of business, and they knew it, and they must, therefore, be held to have had knowledge of their insolvency.

2. Knowing they were insolvent and unable to pay their debts, they conveyed to the defendants a large portion of their property, in part satisfaction of a pre-existing debt. The necessary effect of this conveyance was to give the defendants a preference, and they must be held to have intended the necessary result of their action. The witness, Frisbie, says that in the latter part of December, 1867, "I assisted Mr. Haines in making up his balance sheets; the result was that their available assets were not sufficient to pay their indebtedness."

3. The defendants not only had reasonable cause to believe the bankrupts insolvent, but they had actual notice of the fact. Chetlain, in his deposition, says: "I told Mr. Mahan we could not pay out," and the same witness says that Mahan was in Augusta during the time their goods were levied on, and that they "had an interview with Mr. Mahan on the subject." And the witness, McCurdy, swears that sometime in December, 1867, defendants sent him for collection, a note against the bankrupts, that he was unable to collect it, and he then says: "I wrote to Toof, Phillips, & Co., that I thought they had better look to their interests, as my conviction was that it was doubtful about their being able to collect their debt from William P. Haines & Co. I think shortly after writing this letter that a representative of the house came round to look after the matter. I think it was Mr. F. M. Mahan."

The defendants, in their answer, say: "It is true, as alleged in said bill, that at the time of the said several transactions, said Haines & Co. owed a large amount of debts, but that they were then insolvent is untrue, but, on the contrary, it is true that at the time aforesaid, said Haines & Co. had available assets in excess of their indebtedness, to the amount of sixteen thousand dollars; that while it is true said Haines & Co. did owe Toof, Phillips & Co., they were desirous to secure their debt, yet they deny they did so, or that they made any effort to secure the same, regardless of the rights of other creditors, but at the time aforesaid said Haines & Co. were not only able to secure said debt of defendants, but also to make good and secure all their other liabilities." Here is a direct admission of knowledge of the bankrupts' indebtedness, and the averment that the bankrupts were able to "make good and secure their other indebtedness" is fairly tantamount to a confession that they could not pay in the ordinary course of business, as merchants usually do. They had positive knowledge the bankrupts had not done so in their case, but all doubts on this point are put at rest by the defendants' answer to the first interrogatory of the bill, in which they say: "At the time of making of the transfers, defendants do not believe said Haines & Co. were able to pay their debts in money, but they were able to do so on fair market valuation of the property they owned, and of their assets generally, and they were then able to do so." Here is a direct confession of a fact

that in law constitutes insolvency, and it is idle for defendants to profess ignorance of the insolvency of the bankrupts in the face of such a confession. If the bankrupts could not pay their debts in the ordinary course of business, that is, in money, as they fell due, they were insolvent, and if defendants did not know this constituted insolvency within the meaning of the bankrupt act, it was because they were ignorant of the law, and that ignorance can avail them nothing in this suit; and their denial of knowledge of the insolvency of the bankrupts, must, in view of their own confessions, and the overwhelming proof in the case, be held to be a denial of the law rather than the fact.

The transactions themselves being out of the ordinary course of business, the bankrupt act declares them prima facie fraudulent, and casts on the defendants the onus of showing they were not so. They not only fail to rebut this prima facie case, but their own admissions, and the proofs in the case, show that the transactions were, in fact, frauds upon the bankrupt act. The effort to make it appear that the transfer by the bankrupts, of their homesteads to Mahan, was a bona fide transaction, and that it was entered into without any view or expectation that the consideration Mahan was to pay for the property was to apply as a creditor on the indebtedness of the bankrupts to the defendants, is negatived by every fact and circumstance appearing in the whole case. Chetlain swears positively that it was "expressly understood between me and Mr. Mahan that the drafts (Mahan's drafts for the price of the property) should go to our credit." Haines swears to the same effect. The pretence that Haines & Chetlain were at liberty to make what disposition they pleased of Mahan's drafts on Toof, Phillips, & Co., for the $7,000 agreed to be paid for the property, and that their transmission to Toof, Phillips, & Co., by Haines & Chetlain, with instructions to place to the credit of Haines & Co., was an agreeable surprise, is too incredible for belief. It is obvious that these drafts never would have been paid if Haines & Chetlain had transferred them to any other of their creditors, or if they had demanded the money on them. The claim that Mahan made this purchase in good faith in his own name, and for himself, as "an investment," cannot be supported.

The property which he would have it appear he purchased as an investment on private account, for seven thousand dollars, to be paid in cash, is shown by the testimony of Chetlain to have been worth only $4,000, and by the testimony of Hamblet to have been worth only $3,500, and it is valued by the bankrupts in their schedules at $4,000, and we may reasonably suppose its value was not under estimated by them. The property at the same time was subject to a lien of $740 for the orig-

inal purchase money. That some inducement other than a desire to make "an investment" must have operated on Mahan to have induced him to give $7,000 for property worth at most but $4,000, with an incumbrance on it for $740, is a conclusion which the mind cannot resist. What was that inducement? But one answer can be given to this question: it was to secure this property for his firm, on account of the bankrupts' indebtedness to them; and the testimony of the witness, Mahan, must be based rather on the form of the transaction as evidenced by the papers, than on the actual intention and purpose of the parties. That he expected to pay to his firm $7,000 in cash for taking up the drafts he drew for the agreed price of this property, I do not believe, nor do I believe he could or would so swear. It is true he says "the amount was charged up to him on the books of the firm." So was the title bond assigned to him and the deed made to him, but equity pays no regard to the forms resorted to by parties, in fraud of the law. Chetlain and Haines both swear, and every fact in the case shows that the inducement to this purchase on the part of Mahan, was to secure the value of this property to his firm; and on the part of the bankrupts, it was to give a preference to the defendants, and to obtain further advances. These advances Mahan promised to make in order to secure these conveyances, but as soon as he obtained the conveyances the defendants refused to make any further sales or advances to the bankrupts. Mahan admits he "agreed at the same time to continue selling them goods on the usual time, same as we had been doing before, and we continued to do business with them as usual until some time in the following month." If he means to be understood as saying defendants sold the bankrupts goods on credit, or made any advances to them in any manner, after the date of these conveyances, he is contradicted by the positive testimony of Haines and Chetlain, and by Exhibit A, to his own deposition, which contains a full statement of defendants' dealings with the bankrupts, and shows that defendants did not sell the bankrupts any goods, or give credit to them in any way whatever, after the date of these conveyances.

It must be recollected that in this case the interests, both of the bankrupts and defendants, are adverse to the assignee, for if the plaintiff succeeds it can only be on the ground that the bankrupts made a preference in fraud of the bankrupt act, which would preclude them from obtaining a discharge, and the defendants, of course, are interested to the value of the property. It is not, therefore, very remarkable that they should strive to avoid a conclusion leading to such results. As the evidence shows a state of facts from which the law will infer and declare insolvency and an intent to prefer, it is but fair to presume their denials were intended to repel a charge of actual moral fraud, and that

they were made in ignorance of the legal effect of their action.

No one who will read carefully the pleadings and proofs in this case can resist the conclusion that this transaction was a bold effort of an enterprising and cunning creditor to possess himself of the bulk of the property of the bankrupts, in fraud of the bankrupt act and the other creditors of the bankrupts.

The conclusions reached on the law and the facts of this case are fully supported by the ruling of this court in the case of Rison v. Knapp [Case No. 11,861] and in the following cases: In re Black [Id. 1,457]; Merchants' Nat. Bank v. Truax [Id. 9,451]; In re Arnold [Id. 551]; In re Gay [Id. 5,279]; Haughey v. Albin [Id. 6.222]; Wilson v. Brinkman [Id. 7,794]; Farrin v. Crawford [Id. 4,686]; In re Randall [Id. 11,551]; Ahl v. Thorner [Id. 103]; In re McDonough [Id. 8,775]; In re Kingsbury [Id. 7,816]; Graham v. Stark [Id. 5,676]; Scammon v. Cole [Id. 12,433]; Campbell v. Traders' Nat. Bank [Id. 2,370].

The mortgage on the personal property and the prospective crop of the bankrupts, executed to secure the defendants for advances made and to be made to aid in the production of a cotton crop, was executed many months before they were adjudged bankrupts, and so far as the proof shows, before they were insolvent, or the defendants had reason to believe them to be so, and so far as relates to the property mentioned in this mortgage, the bill is dismissed. As to the real estate conveyed by the bankrupts to Mahan and to the defendants a decree will be entered for the complainant vesting the title of the property in him.

The defendants should be repaid the $740 paid out by them to perfect the title of this property, and the decree will require the complainant to pay that sum to them after deducting therefrom the reasonable rents and profits of the property during the time they have had the possession. A master will be appointed to take and state the account.

Ordered accordingly.

[NOTE. From the decree entered in this case an appeal was taken by respondents to the circuit court. The decree was affirmed. Case unreported. The respondents then appealed to the supreme court, where the decree was again affirmed. 13 Wall. (80 U. S.) 40.]